COLUMBIA AVE. SAVINGS FUND, SAFE DEPOSIT, TITLE & TRUST
CO. v. CITY OF DAWSON et al.

(Circuit Court, N. D. Georgia, W. D. August 3, 1903.)

1. RES JUDICATA—PERSONS CONCLUDED BY JUDGMENT—MORTGAGEE.

A mortgagee is not privy to or bound by a judgment against the mortgagor rendered in a suit commenced after the mortgage was given, and to which he was not a party.

2. FEDERAL COURTS—FOLLOWING STATE DECISIONS.

A decision of the highest court of a state adjudging void a contract made by a city, as beyond its constitutional powers, is not binding on a

¶ 2. State laws as rules of decision in federal courts, see notes to Griffin v. Overman Wheel Co., 9 C. C. A. 548; Wilson v. Perrin, 11 C. C. A. 71; Hill v. Hite, 29 C. C. A. 553.

federal court in a suit involving the rights of a citizen of another state under such contract, unless the rule applied in such decision had been so long and firmly established as to have become a rule of property in the state at the time the contract was made.

**8.** MUNICIPAL CORPORATIONS—CONTRACT WITH WATER COMPANY—RIGHTS OF MORTGAGEE.

Where a contract between a city and a water company provided that the city should, during a term of years, pay an annual hydrant rental to the water company, or such trustee for its bonds as it might select, a trustee in a mortgage securing bonds subsequently issued by the company, which covered all the company's franchises and rights under the contract, has such an interest therein as will support a suit to enjoin its impairment by the city, independently of the water company.

**4.** SAME—DEBTS—CONTRACT TO PAY WATER RENTALS.

A contract by a city to pay a stated sum semiannually as hydrant rentals during a term of years for water to be furnished by a water company for fire purposes does not create a debt, within the meaning of a constitutional provision prohibiting the incurring of debts beyond a certain limit.

**5.** SAME—CONTRACT WITH WATER COMPANY—IMPAIRMENT.

The grant by a city to a water company of the right to lay pipes in the streets, and to supply the city and its inhabitants with water for a term of years, after it has been acted on by the company, creates a contract which is protected from impairment by the federal Constitution, and the city may not during the term directly revoke the grant, or indirectly destroy or impair its value by itself entering into competition with the grantee.

**6.** SAME—SUIT FOR ENFORCEMENT OF CONTRACT—DEFENSES.

A city which paid hydrant rentals for a number of years to a water company under a contract, and then repudiated the contract and refused to make further payment, but continued to use water from the hydrants in case of fires, at no time making any complaint of the service, cannot invoke a forfeiture of the contract because of defective or inefficient service as a defense to a suit for its enforcement.

**7.** SAME—POWER TO COMMUTE TAXES—GEORGIA CONSTITUTION.

Under the Constitution of Georgia, as uniformly construed by the Supreme Court of the state, which construction is binding on the federal courts, a city has no power to exempt a water company from the payment of an ad valorem tax on its property for municipal purposes, either directly or by commuting such taxes in consideration of certain service to be supplied by the company.

**8.** CONSTITUTIONAL LAW—IMPAIRMENT OF CONTRACT—INJUNCTION.

A city granted a franchise to a water company, and also entered into a valid contract for water to be supplied by the company for city purposes during a term of years. It subsequently repudiated such contract, refusing to pay further rentals, in which action it was sustained by the Supreme Court of the state. At an election afterward held, the issuance of bonds was authorized for the purpose of constructing city waterworks. *Held*, that such action constituted an impairment by the state of the obligation of the contract, which entitled a mortgage trustee of the company which was by the contract made the alternative payee of the water rentals, and to which they were assigned by the company, to maintain a suit in equity in a federal court for the specific enforcement of the contract, and to enjoin the city from the issuance of bonds or the construction of a competing system of waterworks during the term of the contract.

---

¶ 4. See Municipal Corporations, vol. 36, Cent. Dig. § 1834.

In Equity. On report of master and exceptions thereto, and motion for final decree.

The following is the report of the master:

### Statement.

The original bill was filed on May 1, 1899, by the complainant, as trustee for the bondholders, against the city of Dawson, certain individuals in their representative capacity as officers of said city, and against the Dawson Waterworks Company. The bill alleged, in substance, as follows:

The Dawson Waterworks Company on September 1, 1891, created the complainant as trustee for 80 of its first mortgage bonds, in the denomination of $500 each, and executed to complainant its mortgage or deed of trust conveying, as security for the payment of its said bonds, all of its real and personal property, corporate rights, franchises, privileges, and appurtenances, together with all incomes, rents, earnings, issues, and profits then or thereafter payable to the company, and in particular the income payable to the said company, or to the trustee for its bondholders, in virtue of the contract with the city of Dawson in that regard. Said bonds, aggregating $40,000 in amount, dated September 1, 1891, and payable September 1, 1916, with interest at the rate of 6 per centum per annum, payable semiannually, were duly issued and sold in open market to bona fide purchasers for value. The bonds were issued and sold in order to procure the money necessary to construct and equip a system of waterworks, as contemplated in a certain contract between the city of Dawson and the waterworks company. This contract is contained in an ordinance of the city of Dawson, acting in its corporate capacity, of February 21, 1890, whereby R. L. Bennett, his associates, successors, and assigns, were to become incorporated under the laws of the state of Georgia under the name of Dawson Waterworks Company, which company, within the time limited, was to construct, complete, and have in operation a thorough system of waterworks in accordance with the specifications and the plans of the contract, and was from time to time to extend its mains and pipes and enlarge its system to meet increasing demands consequent upon the growth of the city; and, in consideration of the company's agreeing to furnish a free and unrestricted use of its water for fire protection for the period of 20 years, the city of Dawson undertook and agreed to pay to the company, or to such trust company as might be chosen as trustee for the bonds to be issued, the sum of $2,000 annually for the period of 20 years; such payments to be made on the 1st days of January and July in each year. The ordinance provided that a tax sufficient to pay such rentals should be annually levied, specified the number of fire plugs to be established, and limited the price to be charged to private consumers.

The city of Dawson, on June 11, 1886, submitted to the qualified voters of the city, after publication of notice thereof for four weeks in the newspaper in which legal notices were published, the question whether the city should incur the expense of waterworks. The election was held, and more than two-thirds of the qualified voters cast their ballots in favor of incurring the expense of waterworks. The result of the election was declared to be in favor of waterworks. The contract entered into between the city of Dawson and R. L. Bennett, as above referred to, was published in full in the public gazette, and was acquiesced in by all of the citizens. The Dawson Waterworks Company was duly incorporated, and proceeded to construct a complete and thorough system of waterworks in accordance with the specifications and requirements of the said contract. The system was fairly and fully tested by the city, and was found to satisfactorily comply with all of the requirements of the contract. The city council of Dawson on August 12, 1891, adopted a resolution declaring that, after fully testing said system, it was accepted by the city as fully complying with the contract. The waterworks company has continued to maintain and operate its system in full compliance with the requirements of said contract continuously from that time, and the city has continuously enjoyed the fire protection contracted for, and for that purpose has continuously used the water so often as required.

It was understood and contemplated by the city of Dawson at the time

of entering into the contract that the money required to construct the system of waterworks was to be procured in whole or in part by the issuance and sale of the bonds of the water company; and, in order to render the bonds more salable, the city, by said contract, agreed and promised to pay to the trustee for the bondholders the annual rental stipulated in the contract, thus inviting investors to become purchasers of the bonds upon the faith that the city would observe its obligations as therein contained. The bonds were negotiated and sold upon the faith that the city of Dawson would pay said rentals, to be applied to the liquidation of the principal and interest of said bonds, and the proceeds of said bonds were used in the construction of the waterworks system.

After using the water without objection or complaint for several years, the city council on June 27, 1894, adopted a resolution declining to further carry out its contract with the waterworks company; assigning as the reason therefor that the contract created such an indebtedness as was forbidden by the Constitution of the state of Georgia, and was therefore not binding upon the city. The waterworks company had in no way failed to comply with its contract, nor had any complaint been made as to the character of the service, the pressure, or the quantity of the water furnished. At the time of the passage of the resolution, the city of Dawson was considering the question of purchasing the waterworks, and it is charged that the purpose of the city in repudiating the contract was to destroy the value of the property, by withdrawing the revenues necessary to its existence, and forcing the company to sell at such price as would be satisfactory to the city. In pursuance of this scheme on the part of the city, an equitable petition was on June 29, 1894, brought in the state court, in the name of certain taxpayers, against the city and the waterworks company, seeking to enjoin the city from paying the rentals accruing to the waterworks company, on the ground that the contract in that regard was void under the Constitution and laws of Georgia. It is charged that this suit was instituted at the instance of the city for the purpose of having its contract with the waterworks company declared void. Upon the hearing the injunction prayed for was denied, and the suit was subsequently dismissed. Prior to that time the city had recognized said contract as valid and subsisting, and had levied and collected the taxes required to meet the annual rentals. The rental accruing for the year 1894 was paid, less a deduction on account of taxes which it was claimed were due the city by the waterworks company as an ad valorem tax on its property therein. Since December 31, 1894, the city has refused to pay or make provision for the payment of the annual rentals due the water company under the contract. In December, 1894, the city, through its mayor, notified the waterworks company that a resolution had been adopted declaring that the city would not be liable on the contract after January 1, 1895, notwithstanding which the city has continuously, since January 1, 1895, availed itself of the fire protection afforded by the waterworks company; thereby intending to take the benefit, though declining to carry out the obligations, of the contract. The public ordinances of the city providing for the use of the water by the fire department were never repealed, the fire companies were not forbidden to further use the water, and no other means of fire protection was provided by the city. Apparatus was furnished by the city to its fire department for the use of the water, and members of the fire companies were given tax exemptions by the city in consideration of their services as firemen. The mayor and members of council, as well as other citizens, subsequently assisted in the use of the water on the occasion of various fires. The waterworks company declined to acquiesce in the repudiation of the contract by the city, and gave notice that it would continue to furnish water with the required pressure for the use of the city for fire protection. The waterworks company has observed the requirements of the contract, has maintained the pressure called for, and has furnished the city at all times with the free and unrestricted use of its water in cases of fire. The waterworks company has at all times held itself in readiness to furnish the water contracted to be supplied in lieu of city taxes to all municipal buildings and for the fountains as specified, notwithstanding which the city of Dawson has assessed, levied, and attempted to collect municipal taxes against the company for the year

1895. An execution for such taxes has been issued and placed in the hands of the city marshal for collection by seizure and sale of the waterworks property.

The city of Dawson called an election for December 12, 1894, to determine whether the city should issue bonds in the sum of $35,000 to erect or buy waterworks and electric lights for the city. The result of the election was declared by council to be in favor of issuing the bonds. Bonds in the amount of $10,000 have been, pursuant to said election, issued and sold, and with the proceeds the city has erected an electric light plant. The remainder of said bonds, amounting to $25,000, have not been sold, but it is charged to be the purpose of the city to invoke a ruling of the court whether its contract with the waterworks company is binding, and, if the decision should be favorable to the city, thereafter to sell the bonds, and with the proceeds erect its own system of waterworks, and dispense with the water supply and fire protection which the city enjoys under its existing contract. It is charged that it was the plan and purpose of the city, while intending to repudiate the contract, nevertheless to continue to use the water, and enjoy the fire protection thereby afforded, until such time as it could sell its bonds and erect its own waterworks. The Supreme Court of Georgia having decided that the contract in question created a debt, and, as such, was forbidden by the state Constitution, the city of Dawson has determined to sell its said bonds, and is now engaged in an effort to procure a sale thereof for the purpose of erecting a system of waterworks, in violation of its contract, and in total destruction of the rights of the waterworks company and the holders of its bonds.

The waterworks company has no property save its waterworks plant and the value of its contract with the city of Dawson. Other than from these sources, it has no means with which to pay operating expenses and the interest and principal of the bonds. The abrogation of its contract with the city would result in the almost complete destruction of the value of the property of the company. If the city of Dawson should be permitted to erect and operate its own system of waterworks, the company would be in no position to compete successfully for the patronage of private consumers.

The waterworks company, recognizing the right of the complainant to pay the rental due and to become due under its contract with the city, in order to protect the rights of the bondholders, has yielded to complainant's demand that it shall in future have the exclusive right to collect from the city of Dawson all rentals accruing under the contract for the year 1896, and subsequent thereto, of which the city has been duly notified, and payment of rentals has been demanded.

The bonds issued by the waterworks company were in the first instance sold to the American Pipe Manufacturing Company, a New Jersey corporation. The latter company sold all of its bonds in open market for value, and the same are now owned by a number of different persons. The American Pipe Manufacturing Company is largely engaged in the construction of waterworks, and frequently receives in payment bonds of the companies for whom the works are constructed, and consequently has frequent occasion to negotiate and sell such bonds, and is interested in seeing that the obligations thereof are duly protected. At the request of the waterworks company, the pipe manufacturing company, in order to save the waterworks plant from foreclosure and sale, has paid the interest falling due on the bonds, up to and including that due on March 1, 1899. These payments were made under an agreement that the pipe manufacturing company should be subrogated to the rights and remedies of the original holders of the interest coupons. Complainant asks leave to repay the pipe manufacturing company the moneys thus expended, if there should come into its hands a surplus sufficient for the purpose over and above the payment of accruing interest on the bonds, and the creation of a sinking fund to be used in discharge of the principal of the bonds.

The bill prays for an injunction against the city of Dawson, restraining the erection, installation, or operation of any system of waterworks in and for said city, or from entering into any contract with any other person for the construction, operation, or use of any system of waterworks, or for the supply of water for fire protection in violation of the contract of the Daw-

son Waterworks Company with the city, or from issuing and disposing of bonds, or from paying out any money, or incurring any obligation, or entering into or carrying out any contract for the creation of a system of waterworks, other than that existing with the Dawson Waterworks Company. It is further prayed that the court will, by injunction, preserve the sanctity and integrity of the contract between the city of Dawson and the waterworks company, and that said contract be decreed to be valid and mutually binding upon the parties thereto; that the said contract be required to be specifically enforced; that the complainant may recover from the city, in trust for the benefit and use of the bondholders, the rentals due by the city for the use of the water for the year 1896 and succeeding years; and for general relief. Attached to the bill, as exhibits, are the mortgage or deed of trust referred to, and the ordinances of the city creating the contract between the parties. Upon this bill a rule nisi was duly issued and served, and a temporary restraining order was granted.

On June 26, 1899, prior to the hearing of the rule, the complainant, by leave of the court, amended its bill of complaint, alleging that the ordinance of the city of Dawson repudiating its contract was an attempt to impair the obligation of the contract and destroy the value of the property of the waterworks company, in violation of the Constitution of the United States; that the ordinance of said city of October 4, 1894, ordering an election for the purpose of determining whether the city should issue bonds for the purchase or erection of a system of waterworks and an electric light plant, and the ordinance of November 5, 1894, declaring the result of the election held under the prior ordinances, and the refusal of the city to levy a tax for the purpose of paying the rentals due the water company, are likewise in impairment of the obligations of its contract with the waterworks company, and in violation of the Constitution of the United States. It is further alleged that such ordinances and conduct on the part of the city, if given effect, will deprive the holders of the bonds of the waterworks company, as well as the waterworks company itself, of their property without due process of law, in violation of the federal Constitution. The other matters contained in the amendment are not material to be now referred to.

In answer to the rule, the city of Dawson objected to the jurisdiction on the ground that, after arranging the parties according to interest, the requisite diversity of citizenship did not exist. The city further answered, denying the material allegations of the bill, and contending that the alleged contract between the city and the waterworks company was utterly void, under the Constitution and laws of the state of Georgia, and had been so declared by the Supreme Court of the state of Georgia in the case of City of Dawson v. Dawson Waterworks Company, 106 Ga. 696, 32 S. E. 907. The answer of the city is hereinafter more fully referred to.

The cause came on to be heard under the rule before Circuit Judge PARDEE, whereupon the court, after considering the evidence and the argument of counsel, granted on September 16, 1899, an order for injunction pendente lite, as prayed in the bill, and further ordered that the defendants might apply to the court at any time after 30 days from the date of the order for a test of the ability of the Dawson Waterworks Company to perform its obligations in regard to the furnishing of the water to the city of Dawson for municipal purposes and fire protection, according to the letter and spirit of its contract, and upon such application the court would order a test and trial of the same by experts, under the direction of a master, and take such action upon the master's report as equity might require. The injunction as ordered was duly issued. From this order granting an interlocutory injunction an appeal was duly prosecuted to the Circuit Court of Appeals. That court dismissed the appeal without considering the merits of the controversy, upon the ground that an appeal will not lie to a Circuit Court from an order granting an interlocutory injunction in a case involving the construction and application of the Constitution of the United States. City of Dawson v. Columbia Avenue, etc., Company, 102 Fed. 200, 42 C. C. A. 258.

To the original bill the defendant city of Dawson demurred for want of jurisdiction in the court, on the ground that, after arranging the parties according to interest, the requisite diversity of citizenship did not exist, and

on the further ground that no federal question was involved. The defendant also demurred to the bill for want of equity, on the ground of an adequate remedy at law. After argument of counsel, the demurrer was overruled on July 8, 1901; "the court considering the law and equity to be with the complainant, and the demurrer to said bill not well taken." Thereafter, on the 3d day of August, 1901, the city of Dawson and the defendants, who were being sued in their representative capacity as officers of said city, filed their answer to the bill as amended. The answer is, in substance, as follows:

The Dawson Waterworks Company, a Georgia corporation, is the real complainant in the litigation, and the bill has been brought in the name of Columbia Avenue Trust Company as complainant, with the waterworks company as defendant, collusively, and for the purpose of conferring jurisdiction upon the federal court, and for the further purpose of avoiding the judgment of the Supreme Court of Georgia declaring the contract involved to be invalid. Wherefore it was prayed that the court dismiss the bill for want of jurisdiction.

Further answering, the defendants say that, under the Constitution and laws of Georgia, the alleged contract between the waterworks company and the city is absolutely void ab initio, because expressly prohibited. On the 14th day of March, 1899, the Supreme Court of Georgia, in the case of City of Dawson v. Dawson Waterworks Company, adjudged that, under the Constitution and laws of Georgia, and its settled public policy, the said contract was void ab initio, and that complete performance on the part of the waterworks company did not estop or prevent the city from pleading the illegality of the contract. The complainant, Columbia Avenue, etc., Trust Company, is a mere privy and assignee of the cause of action involved in the decision by the Supreme Court of the state, and has become such since said decision. The defendants plead that all of the questions and issues now made in the bill as amended are res judicata, and they pray the court to follow the judgment of the Supreme Court of the state. The answer contains a general denial of the material allegations of the bill.

The election held by the city in 1886 to determine whether the city should incur the expense of waterworks was void for uncertainty, and has been so declared by the Supreme Court of Georgia, and was insufficient to predicate the contract in question, or any legal contract. It is admitted that in June, 1894, the city repudiated and renounced the alleged contract with the waterworks company. Since the year 1894 the city has not, in its public capacity, used or authorized the use of any of the water of the waterworks company. If any of the city officials have used the water on occasions of fire, it was in their capacity as private citizens acting in an emergency.

It is denied that the complainant sustains any contractual relation to the city with reference to the subject-matter of the suit, or, if such relation did exist, the contract, being totally void, could not be valid for the benefit of any party thereto, or of third persons whose rights depended upon those of the parties. Defendants deny any improper motive in repudiating the contract, and deny any effort or intention to impair the value of the property of the water company, or force the company to sell to the city for less than its value.

Refusal to pay water rentals for the year 1895 and succeeding years is admitted. It is averred that during these years the system of waterworks has been defective, insufficient, unreliable, and almost unserviceable as a means of protecting the city from fire. The required amount of pressure did not exist. The system was not kept in proper condition for prompt and effectual use, and was so unsatisfactory that, on nearly every occasion when the citizens endeavored to use the water to extinguish fires, there was a failure to obtain sufficient water under the required pressure. During these years the water company had notice and knowledge of the inadequacy and inefficiency of the system, and on one occasion, in June, 1897, on a test made by the superintendent of the company under the conditions laid down in the contract, the system failed to measure up to the standard, in that the water was thrown vertically not more than 30 feet, instead of 50, as required. The inefficiency of the system as then demonstrated had continuously existed since 1894 up to the date of the filing of the bill.

The remission of municipal taxes, as contained in the said contract, is utterly void under the laws of the state. Since the renunciation of the contract by the city, it has not used or received the water of the water company under the terms of the contract or otherwise, and taxes upon the water company's property for the year 1895 and succeeding years are due and unpaid.

It is not denied that the city proposes to erect its own system of waterworks, but it is contended that, under the decision of the highest court of the state, it has the right to do so. It is denied that the complainant, as trustee, has any right to maintain this suit for the benefit of the bondholders. In reality, the suit is at the instance and for the benefit of the water company, which had been allowed to collect all rentals from the city until after the litigation in the state court. The water company has no exclusive franchise for completing, equipping, and operating waterworks in the city, and, under the Constitution and laws of the state, can have none; nor is the city prevented from constructing and maintaining its own system, after complying with the requirements of the law in that regard. The city and its inhabitants have suffered damage and injury by reason of the inadequacy of the present system, and, the water company being insolvent, it became the right and duty of the city to provide an adequate and satisfactory system for fire protection, and for the health, safety, and welfare of the inhabitants of the city. It is true that the city has never complained to the Columbia Avenue Company as to the inefficiency of the waterworks or the character of the service, because the city did not know that the complainant was entitled to such notice, and for the further reason that the city, having declined to carry out the alleged contract and to pay the water rental accruing thereunder, considered that it had no right thereafter to complain to any one touching the inefficiency of the service.

Not only was the water furnished by the water company insufficient to afford the fire protection contemplated in the contract, but it was impure, unwholesome, and unfit for domestic use and sanitary purposes. At times the water was so muddy it was unfit for drinking or bathing purposes, and on several occasions was so thick with mud that a flow could not be obtained for use in extinguishing fires. The sources of water supply were designated by resolution of the city council of March 14, 1891. The water company has not derived its supply solely from these sources, or either of them, but has furnished water mingled with surface and branch waters, and from the waters washing from the adjacent hills and fields. This water it has allowed to accumulate in swampy places, covered with undergrowth and woods. The water so obtained was furnished without being filtered, and was loaded with mud and filth.

To this answer, replication was duly filed, and at this stage of the cause reference was made to the master.

### Findings of Fact.

(1) The city council of Dawson, by ordinance of May 10, 1886, directed an election to be held on June 11th following, at which the question of incurring the expense of waterworks should be submitted to the qualified voters of the city. At this election the ballots cast were for "waterworks" or "no waterworks." The result of the election was in favor of waterworks, and this result was declared by the city council on July 18, 1886. Following this election, the officials of the city made some effort to secure a system of waterworks, but no substantial results were accomplished. No definite plans for a system of waterworks had been developed, nor were any negotiations looking to a particular contract either pending or in contemplation at the time. Nearly four years thereafter, the city entered into the contract with R. L. Bennett which forms the subject of this suit. Neither in the negotiations leading up to the contract, so far as the evidence discloses, nor in the contract itself, is there any mention of or reference to this election as furnishing authority for the contract, or as an inducement thereto. I therefore find, as a matter of fact, that at the time of the contract the result of the election of June 11, 1886, was not in contemplation of the parties, and that the said election constituted no authority for entering into the contract on the part of the city.

(2) The contract entered into between R. L. Bennett and the city of Dawson is in the form of an ordinance adopted February 21, 1890, and is, in substance,

as follows: Section 1 grants to R. L. Bennett, his associates, successors, and assigns, who are to become incorporated as the Dawson Waterworks Company, the exclusive right and privilege, for the period of 99 years, of constructing, maintaining, and operating a system of waterworks for the purpose of supplying the city and its inhabitants with water for protection against fire, and for domestic, sanitary, and other useful purposes. Section 2 confers upon the company the exclusive right and privilege of excavating and laying water pipes and mains along the streets and avenues of the city, as then open or as thereafter extended. Section 3 gives the right to erect buildings, tanks, and other structures, and make necessary improvements, on lands owned or controlled by the city, excepting its public squares. Section 4 requires the company to complete and have in operation within 18 months a complete and thorough system of waterworks, to consist of 4.8 miles of pipe, of 4, 6, and 8 inches in diameter, with a reservoir of not less than 40,000 gallons capacity, "and of sufficient height to produce a pressure on the mains such that from any hydrant located on the principal streets a stream of water will be projected fifty (50) feet vertically in still air through one hundred feet of fire hose with a one-inch nozzle attached." The company is required to continue during its existence to furnish a sufficient supply of water for the purposes named, unless prevented by unavoidable and providential cause, in which event it should be allowed a reasonable time within which to make repairs, after which, should it fail to furnish such supply of water, its franchise, from that fact, should be forfeited. Section 5 provides that the company shall from time to time extend its mains and enlarge its system to meet the increasing demands consequent upon the growth of the city. Section 6 recites that in consideration of the company guarantying to the city for the period of 20 years, and as long thereafter as the company should operate the waterworks, a free and unrestricted use of the water for fire protection, and agreeing to establish at convenient places, not exceeding 50, fire plugs of approved pattern, to be increased in number as the city grows in population, and to furnish, for fire protection only, water to fill the public cisterns, the city obligated itself "to pay to the said Company or to such trust company as the Dawson Waterworks may elect or decide upon as their trustee for their bonds the sum of two thousand ($2,000) dollars annually for twenty years," in semiannual payments of $1,000 each, on the 1st day of January and July in each year, and in case the city should, from lack of funds or other cause, fail to make such payments on the days named, it agreed that warrants should be issued on the city treasurer in favor of the company for the amount due. Section 7 required the city council to make provision each year for the payment of the stipulated rental by levying a tax sufficient for the purpose upon the taxable property in the city. Section 8 limited the charges to private consumers of the water, and prescribed a schedule of maximum charges for various uses. Section 9 contains the agreement that, in consideration of water to be furnished the public municipal buildings and two public fountains, "the City of Dawson hereby obligates itself to remit to said Company, its successors and assigns, any and all license fees, taxes, dues and charges which may at any time hereafter be levied or assessed by said City against said company or upon the plant to be used in said waterworks system." Section 10 gives the assent of the city to the charter that may be obtained by the waterworks company; conferring upon it the exclusive franchise to construct, maintain, and operate a system of waterworks in the city. Section 11 declares "that the provisions of this ordinance shall be mutually binding upon the City of Dawson and R. L. Bennett and associates, and the company to be organized by them in pursuance of the provisions thereof, and it shall have the force and effect of a contract between the respective parties as fully and completely as if it were drawn in that form and signed by the contracting parties." I find that the ordinance as above recited and referred to was accepted by R. L. Bennett, and constituted the contract as between him and the city of Dawson. This contract and the franchises therein granted were subsequently, on March 17, 1891, transferred and assigned by R. L. Bennett to the American Pipe Manufacturing Company, and by that company were on August 20, 1891, transferred and assigned to the Dawson Waterworks Company, which company had become incorporated under the laws of the state of Georgia.

(3) I find that the city of Dawson had express notice that bonds were to be issued and sold for the purpose of procuring the money with which to construct the waterworks plant, and that the city acquiesced in this arrangement. In the original ordinance of February 21, 1890, creating the contract between the parties, the city agreed to pay the water rental to the waterworks company, or to such trust company as the waterworks company might elect or decide upon as trustee for their bonds. At a meeting of the city council held on March 23, 1891, a communication was received from the American Pipe Manufacturing Company stating that it had purchased the franchises of R. L. Bennett to build waterworks in the city, and asking for an extension of 60 days to begin the work, in order to have an opportunity to market bonds. The council adopted a resolution granting an extension of 60 days as and for the purpose requested.

(4) The city designated the source from which water was to be taken by the waterworks company, and declared by resolution of March 14, 1891, that either or all of the sources therein specified should be accepted as supply for water to fill the contract and franchises granted R. L. Bennett and his associates. Samples of water from each of these sources had been taken by the mayor of the city and forwarded to the state chemist for analysis. After analysis the chemist reported that each of these waters were pure and safe, and one (taken from a source subsequently adopted) was reported to be "clear and odorless, with a faint yellowish brown color, due to vegetable matter in solution. On standing, traces of organic sediment are deposited. Organic impurity very slight and mainly vegetable. A perfectly pure and safe water." On March 14, 1891, the mayor wrote the American Pipe Manufacturing Company, inclosing copies of these analyses, together with copy of the resolution of the city council designating the source of supply. An official of the pipe company visited Dawson, inspected the sources of supply pointed out, and selected those which were deemed sufficient for supplying the requisite quantity of water.

(5) The system of waterworks as contemplated was constructed by the American Pipe Manufacturing Company. After its completion the system was tested by the city, in order to ascertain if it came up to the requirements of the contract. After making this test, the city, on August 12, 1891, executed a formal acceptance in writing, and caused to be entered upon the minutes of the council a declaration accepting the system of waterworks as fully complying with the contract in all particulars.

(6) The Dawson Waterworks Company on September 1, 1891, caused to be issued 80 first mortgage bonds, in the denomination of $500 each, aggregating the sum of $40,000, payable on the 1st day of September, 1916, with interest at the rate of 6 per cent. per annum, payable semiannually. Payment of these bonds was secured by a mortgage to the complainant, Columbia Avenue Company, as trustee, of even date, conveying all the real and personal property of the water company, including its corporate rights, franchises, and privileges, then owned or thereafter to be acquired, together with any and all income then or thereafter payable to the water company under any agreement made between the company and the city of Dawson, or payable under any ordinance of the said city. Before accepting this trust the president of the Columbia Avenue Company visited Dawson in person, inspected the system, examined into the contract with the city, and satisfied himself that proper support existed to enable the waterworks to be successfully operated. The entire issue of bonds was accepted by the American Pipe Company in payment for its work and material in the construction of the waterworks system. All of the bonds were subsequently sold to bona fide purchasers for value at prices varying from 92½ to 100, the aggregate derived from the sale of the bonds amounting to $37,927.23. These bonds are now owned and held by various persons, whom I find to be bona fide purchasers for value.

After the installation of the system, and its acceptance by the city as fully complying with the requirements of the contract, the waterworks were for several years operated to the mutual satisfaction of the parties. During this time the city promptly paid the rentals as they fell due, and appears to have made no complaint of any kind, either with reference to the quality or quantity of water, or the efficiency of the service. In May, 1894, the city instituted

130 F.—11

negotiations looking to a purchase of the waterworks system. These negotiations resulted in a failure to agree. Early in July the proposition of the water company was formally declined by the city, and all negotiations were terminated. In the meantime certain taxpayers of the city filed an equitable petition against the city to restrain it from paying water rentals, on the ground that the contract with the waterworks company was ultra vires of the city and void. The injunction prayed for was denied, and the bill was dismissed. On June 27, 1894,. the city council adopted a resolution declining to carry out the contract with the Dawson Waterworks Company, and providing for the appointment of a committee to make such arrangements as would be satisfactory to the council and to the waterworks company. This resolution was duly communicated to the Dawson Waterworks Company, which declined to acquiesce in the abrogation of the contract. The city paid for the use of the water for the remainder of the year 1894, less a deduction claimed to be due the city on account of taxes, and on December 14, 1894, notified the water company that unless a new agreement could be reached between them as to the subsequent use of the water for one year from January 1, 1895, the city would not be liable under the contract after the date named. The water company declined to enter into a new agreement, insisting upon the validity of its existing contract, and notifying the city that it would continue to supply the water and maintain the service as in the contract required.

During the year 1895 the water company continued to maintain and operate its system, and furnish water for the uses of the city. Only one fire occurred during the year 1895. At this fire, water from the mains and plugs of the water company was used. After the expiration of the year, the city declining to pay the water rentals, the water company brought an action at law for recovery in the superior court of Terrell county. The superior court directed a verdict for the water company. On writ of error, the Supreme Court of the state reversed judgment of the court below, and declared that, while the city might be liable from year to year for the water used under the contract for the particular year, the contract as to future years created an indebtedness such as is forbidden by the Constitution of the state, and was for that reason invalid and not binding upon the city. This decision and its effect are hereinafter more fully discussed. The water has since been continuously used on the occasions of numerous fires, and whenever so required. The city claims that, notwithstanding that its officials participated in this use of the water, their action was that of any citizen in an emergency, and was not authorized by the city in its corporate capacity.

I find that the city fire organization was maintained during the years following 1894 as it was in preceding years. While at times this organization was not in an efficient state, it was never disbanded. The city continued to furnish hose and fire apparatus, and to grant to the members of fire companies exemption from municipal street taxation. No other means for fire protection was afforded by the city, so that it must have been recognized that, in any emergency of fire, resort to the use of the water of the waterworks company was necessary and inevitable. The city did not forbid the use of this water by its fire department, and must have known that it was being continuously so used. In 1898, prior to the filing of this bill, the city brought its fire department up to a higher state of efficiency, with a paid chief at its head. I accordingly find that, notwithstanding the city had repudiated the contract, it has continued to enjoy the fire protection afforded by the waterworks company, and to use the water for that purpose on every occasion in the same manner and to the same extent that it did prior to its repudiation of the contract.

(8) The source of water supply adopted by the water company from among those designated by the city consisted of a running stream, into which directly flowed the water of what is known as Dunn's Spring, some 400 yards above the take-in of the water company. These waters were among those analyzed by the state chemist, and by him pronounced safe and pure. The watershed does not cover an extended area. The stream above flows through land which is more or less marshy, and upon which there is considerable vegetable growth. The surface water from adjoining hills on one side of the stream flows in above the point of supply. On the crest of these hills are several small residences, the washings from whose premises flow into the stream. There is

also on the watershed a scaffold, which has been used from time to time for the slaughtering of cattle in a small way. The stream from which the water supply is derived is not protected from these surface washings by means of dikes or other devices. The condition of the watershed is substantially the same now as it was at the time of the selection, and as it has been since. The evidence does not disclose when the slaughtering of cattle began, or how extended it has been. The water is not filtered, but is taken directly from the stream, and pumped to a standpipe or reservoir in the city, from which it is distributed by gravitation through mains and pipes to consumers.

I find from the evidence that at certain seasons of the year the water is safe and pure, as shown by the analysis of the state chemist. At other seasons, during periods of continuous rainfall, the water is muddy, and must to some extent be contaminated by reason of the surface washings from the watershed as described. It was disclosed in the evidence that an analysis of the water had been made at the instance of the city or some of its citizens, but this analysis was not offered in evidence, nor was any expert evidence as to the quality of the water introduced, excepting the analysis of the state chemist, as above referred to.

The General Assembly of the state of Georgia passed an act, approved September 7, 1891, for the protection of the water supply of the waterworks for the city of Dawson. By this act it was made unlawful to obstruct or interfere with the flow of the stream, or pollute or contaminate in any way or by any means the water of the stream or watershed, so as to affect in any degree the quality or purity of the water. It was made unlawful to place or deposit any dead animal or vegetable matter in the swamp bordering on and surrounding the stream, its springs and branches, so as to affect the purity and quality of the water. The violation of these provisions was declared to be a misdemeanor. The police supervision of the marshal and policemen of the city of Dawson was extended over the watershed, and the officers were empowered to make arrests therein for violation of the provisions of the act. The ordinance of the city of Dawson made it the duty of the mayor to appoint three members of the council, whose duty it should be to superintend the waterworks and water supply of the city, and to see that the owners of the waterworks company complied with their obligations in furnishing water to said city and private individuals. City Code, par. 242.

(9) The water company erected a reservoir exceeding in capacity that required by the contract. The height of this reservoir from its bottom to the surface of the earth below was 65 feet. Upon a test by the city it was ascertained and declared that the system met with the requirements of the contract, and I therefore find that the reservoir was of the prescribed height and capacity. Much evidence was introduced and offered to show that sufficient pressure had not constantly been maintained. It appears that on one occasion the reservoir was found to be empty, but this occurred shortly after the construction of the waterworks, and before the repudiation of the contract by the city, and is therefore not material to be considered in the present case. At times the reservoir leaked. On one occasion the local superintendent of the water company tested the pressure from a point on what is known as an "end pipe." The water failed to reach a height of 50 feet vertically. It was shown that this test was a voluntary act of the local superintendent, without notice to the officers and owners of the waterworks company or to the city. Gauges indicating the height of the water in the standpipe, and the consequent pressure, were placed at the pumping station of the water company, and also in the engine house of the city fire department. Excepting on rare occasions, the reservoir was kept supplied with water sufficient to produce the required pressure. No complaint concerning the character of the service or the amount of the pressure was made to the water company until after the institution of the present suit. The water company has since erected a new reservoir of more than double the capacity required in the contract, and of a greater height than the first reservoir. Since the erection of this new reservoir, there has been no complaint or question as to the pressure.

(10) In repudiating its contract with the waterworks company, the city did not base its claim of right upon any inadequacy of supply, inefficiency of service, or quality of water furnished by the water company. The system

had been in operation for 3½ years, its water supply being derived then as now from the sources designated and approved by the city. During these years the surface washings from adjoining hills flowed into the stream during times of rain, and on such occasions the water was muddy. There was no request on the part of the city for the waterworks company to supply protection to the watershed, other than as existed then and now; nor was any request made that the water be filtered, or that the water tower be increased in either height or capacity. The city predicated its right to renounce the contract upon the ground of a want of authority in the preceding administration to bind the city by such a contract, for that it created an indebtedness forbidden by the Constitution of the state. The evidence makes it clear that the city was moved to this action, not only because it considered that it had the right so to do, but also because the contract was regarded as unfair and exorbitant. The facts and surrounding circumstances disclosed the evident purpose on the part of the city to either purchase the waterworks at a price satisfactory to it, or to make new agreements on more favorable terms for the use of the water from year to year, or to construct and operate its own system of waterworks. Failing to succeed in purchasing the waterworks, or in obtaining satisfactory agreements for the use of the water from year to year, the city submitted to its qualified voters a proposition authorizing it to issue bonds for the construction of an electric light plant, and also for the construction of a system of waterworks. Of the bonds so authorized, $10,000 have been issued, and the proceeds used in the construction of an electric light plant. The remaining $25,000 have not been issued or sold, but the city does not deny that its purpose is to use the proceeds of these bonds for the construction of a system of waterworks, unless it is prohibited by the court from doing so.

(11) During the years succeeding 1895 the only water furnished by the water company for municipal public buildings was through one opening at the engine house of the fire department. The fountains mentioned in the contract to be supplied with water have not been maintained by the city.

(12) The city levied an ad valorem tax on the property of the waterworks company for the year 1895. The amount of the tax so assessed not having been paid, the city caused a tax execution to be issued therefor, and caused the same to be placed in the hands of its city marshal for collection by process of law. Further proceedings on this execution have been temporarily enjoined by this court.

(13) I find that no application has been made on the part of the city to test the system of waterworks, as provided in the order of this court of September 16, 1899.

(14) Subsequent to the decision of the Supreme Court in the case of City of Dawson v. Dawson Waterworks Company, the waterworks company assigned to complainant the exclusive right to demand, collect, and receive the water rentals to be paid by the city of Dawson, as provided in the contract.

(15) I find that the revenues of the waterworks company from and including the year 1895, exclusive of the rentals claimed to be due by the city, have been insufficient to pay the operating expenses and fixed charges.

(16) I find that the American Pipe Manufacturing Company loaned to the waterworks company, from time to time, funds sufficient to meet the accruing interest on the outstanding bonds of the water company from September 1, 1895, up to and including March 1, 1899, amounting in the aggregate to $8,560. For these loans, checks were drawn payable to Dawson Waterworks Company, and the proceeds deposited to its credit. The coupons, as they fell due, were paid by the waterworks company to the trustee. No other notice was given the trustee that these payments were made other than from the ordinary revenues of the waterworks company. The coupons thus paid and taken up by the waterworks company were not assigned or delivered to the pipe company. I therefore find that the transaction constituted merely a loan by the pipe company to the waterworks company, with no express agreement, so far as the evidence discloses, that the coupons should be assigned to the pipe company, or that it should be subrogated to the rights of the bondholders therein.

(17) The Columbia Avenue Company was without notice of the litigation between the city of Dawson and the waterworks company until after the decision of the Supreme Court of the state, of March 18, 1899.

## Conclusions of Law.

1. To the Jurisdiction. The answer sets up an objection to the jurisdiction on the ground that the suit is collusively brought by the complainant at the instance and for the benefit of the waterworks company, for the purpose of conferring jurisdiction on this court, and of avoiding the judgment of the Supreme Court of Georgia. It is contended that the waterworks company is the real complainant, and that its transfer to the Columbia Avenue Company of the exclusive right to collect the water rentals from the city of Dawson was merely colorable, and was intended to predicate a suit in this forum. The only effect of such a transfer, in so far as concerns the jurisdiction, would be to create the diversity of citizenship necessary to suit in the federal court. If the jurisdiction rests upon an independent ground, the diversity of citizenship is immaterial. The court, in overruling the demurrer in this case, decided that a federal question sufficient to sustain the jurisdiction was presented. It is therefore immaterial to inquire what motive prompted the waterworks company to make the assignment.

One of the grounds of the demurrer was for want of equity. The overruling of the demurrer on this ground adjudicated the right of the complainant to institute and maintain this suit. That the waterworks company will be benefited, and that the suit was instituted at its instance, are questions that do not concern or affect the jurisdiction of the court, and I therefore conclude that the objection to the jurisdiction is not well taken.

2. On the Merits. The leading question presented in this controversy concerns the effect of the decision of the Supreme Court of Georgia in holding the contract to be void, as between the city, and the waterworks company, on the ground that it created an indebtedness such as is forbidden to cities by the Constitution of the state.

(1) The city contends that the question so involved and decided in that case is res judicata as against the complainant in this case. The matter is properly the subject of a plea, rather than an answer; but, no objection having been taken, the question will be considered as if properly pleaded. This suit is upon a different cause of action from that in the state court. If it be treated as being between the same parties or their privies, it is well established that a right, question, or fact distinctly put in issue and directly determined in the first suit cannot be disputed in a subsequent suit. Such right, question, or fact is to be taken as conclusively established. The judgment, however, in another suit upon a different cause of action, operates as an estoppel only as to the point or question actually litigated and determined, and not as to other matters which might have been litigated and determined. Southern Pac. R. Co. v. United States, 168 U. S. 1, 18 Sup. Ct. 18, 42 L. Ed. 355; New Orleans v. Citizens' Bank, 167 U. S. 371, 17 Sup. Ct. 905, 42 L. Ed. 202; Nesbit v. Independent District of Riverside, 144 U. S. 610, 12 Sup. Ct. 746, 36 L. Ed. 562; Cromwell v. Sac County, 94 U. S. 351, 24 L. Ed. 195; Wilmington & Weldon R. Co. v. Alsbrook, 146 U. S. 279, 13 Sup. Ct. 72, 36 L. Ed. 972; Keokuk & W. R. Co. v. Missouri, 152 U. S. 301, 14 Sup. Ct. 592, 38 L. Ed. 450; Roberts v. Nor. Pac. R. Co., 158 U. S. 1–30, 15 Sup. Ct. 756, 39 L. Ed. 873; Last Chance Mining Co. v. Tyler Mining Co., 157 U. S. 683, 15 Sup. Ct. 733, 39 L. Ed. 859. If, therefore, the question of the validity of the contract was distinctly put in issue, and directly determined by the Supreme Court of Georgia, its decision would be conclusive upon the parties to that suit and their privies. The complainant here was not a party to the state court litigation, but it is contended that it is a privy in right and estate to the waterworks company, which was a party. A mortgagee is privy in estate to the mortgagor as to actions begun before the mortgage was given. As to suits subsequently begun, he is not a privy, nor is he bound by judgments or decrees therein against the mortgagor, unless he, or some one authorized to represent him, is made a party to the litigation. Keokuk & W. R. Co. v. Missouri, 152 U. S. 301, 14 Sup. Ct. 592, 38 L. Ed. 450; Hassall v. Wilcox, 130 U. S. 493, 9 Sup. Ct. 590, 32 L. Ed. 1001; Louisville Trust Company v.

Cincinnati, 76 Fed. 296, 22 C. C. A. 334; Larison v. Hager (C. C.) 44 Fed. 49; Southern Bank & Trust Co. v. Folsom, 75 Fed. 929, 21 C. C. A. 568; Central Trust Company v. Hennen, 90 Fed. 593, 33 C. C. A. 189. Louisville Trust Company v. City of Cincinnati, 76 Fed. 296, 22 C. C. A. 334, is closely in point. The Louisville Trust Company was the trustee under the mortgage to secure an issue of bonds by the Inclined Railway Company. The mortgage included franchises, rights of way, and easements. Subsequently the city of Cincinnati brought suit against the railway company in the state court, in which it was decided that certain street franchises enjoyed by the railway company had expired by limitation, while certain others were void. This judgment was affirmed by the Supreme Court of the state. The trust company brought suit against the city in the federal court, in which suit these questions were involved. The court, after declaring the franchise to occupy a public street created such a property right as was subject to assignment or mortgage, further said that the mortgagee could not be deprived of this security by a proceeding directly impeaching its validity and duration, without being made a party thereto. Hence I conclude that the complainant in this case was not a privy of the waterworks company as to the suit in the state court, so as to be conclusively bound thereby, and that the doctrine of res judicata does not apply to it.

(2) It is insisted that the decision of the Supreme Court of Georgia declaring the invalidity of the contract will be regarded as conclusive in this forum, in deference to the rule that the federal courts will follow the construction given constitutions and statutes by the highest court of the state. The general rule is as stated, but it is subject to important limitations and exceptions. The federal court, in construing the meaning of a state statute as to what contract is contained therein, and whether the state has passed any law impairing its obligation, is not bound by previous decisions in state courts, except when they have been so long and so firmly established as to constitute a rule of property, but will decide independently whether there is a contract, and whether its obligation has been impaired. County of Shelby v. Union & Planters' Bank, 161 U. S. 149, 16 Sup. Ct. 558, 40 L. Ed. 650; L. & N. R. Co. v. Palmes, 109 U. S. 244, 3 Sup. Ct. 193, 27 L. Ed. 922; Vicksburg, S. & P. R. Co. v. Dennis, 116 U. S. 665, 6 Sup. Ct. 625, 29 L. Ed. 770; Mobile & Ohio R. Co. v. Tennessee, 153 U. S. 486, 14 Sup. Ct. 968, 38 L. Ed. 793.

In the leading case of Burgess v. Seligman, 107 U. S. 20, 2 Sup. Ct. 10, 27 L. Ed. 359, the Supreme Court of the United States, on special consideration, distinctly stated the rule and its limitation as follows: "The federal courts have an independent jurisdiction in the administration of state laws, co-ordinate with, and not subordinate to, that of the state courts, and are bound to exercise their own judgment as to the meaning and effect of those laws. The existence of two co-ordinate jurisdictions in the same territory is peculiar, and the results would be anomalous and inconvenient, but for the exercise of mutual respect and deference. Since the ordinary administration of the law is carried on by the state courts, it necessarily happens that by the course of their decisions certain rules are established which become rules of property and action in the state, and have all the effect of law, and which it would be wrong to disturb. This is especially true with regard to the law of real estate and the construction of state constitutions and statutes. Such established rules are always regarded by the federal courts, no less than by the state courts themselves, as authoritative declarations of what the law is. But where the law has not been thus settled, it is the right and duty of the federal courts to exercise their own judgment, as they also always do in reference to the doctrines of commercial law and general jurisprudence. So, when contracts and transactions have been entered into, and rights have accrued thereon, under a particular state of the decisions, or when there has been no decision of the state tribunals, the federal courts properly claim the right to adopt their own interpretation of the law applicable to the case, although a different interpretation may be adopted by the state courts after such rights have accrued. But even in such cases, for the sake of harmony and to avoid confusion, the federal courts will lean towards an agreement of views with the state courts if the question seems to them balanced with doubt." The case on this point has been followed and approved in a great

number of cases, which need not be cited. See Bartholomew v. City of Austin, 85 Fed. 359, 29 C. C. A. 568.

In Speer v. Board of County Commissioners, 88 Fed. 749, 32 C. C. A. 101. the question presented related to the validity of certain county warrants. The Supreme Court of the state declared these warrants invalid. The holder of other warrants brought suit in the Circuit Court of the United States. The Circuit Court of Appeals for the Eighth Circuit declined to follow the decision of the state court, upon the ground that "decisions of state courts as to their statutes, which affect the validity of contracts between citizens of different states which were made, or under which rights were acquired, before there was a judicial construction of the statute which seemed to authorize the contracts, are not obligatory upon the courts of the United States." The same Court of Appeals considered Clapp v. Otoe County, 104 Fed. 473, 45 C. C. A. 579, in which case an action upon county bonds had been instituted. The bonds had been declared void by the Supreme Court of the state. The court declared the rule that "national courts uniformly follow the construction of the Constitution and statutes of a state given by its highest tribunal in all cases that involve no question of general or commercial law, and no question of right under the Constitution and laws of the nation." It was pointed out that the plaintiff in that case had purchased the bonds prior to the decision of the state court, without notice of any defect in their execution; that upon this purchase he entered into a contract relation with the county, and by such purchase he acquired the right, under the Constitution and laws of the United States, to have his contract interpreted and his rights enforced in a court of the United States, and to invoke the independent judgment of that court upon the legal questions involved. The court, speaking through Circuit Judge Sanborn, said: "No decision of a state court, rendered after his rights under these contracts had vested, could forestall the judgment of a national court upon these questions, or deprive him of the right to invoke or relieve a federal court of the duty to accord its independent consideration and decision of his case. Much less could the decision of a state court, which studiedly ignored the rights of innocent purchasers of these bonds, and which was not rendered until 10 years after they were bought, deprive the purchaser of the right to the independent opinion of the federal court to which he presents them."

In Louisville Trust Company v. City of Cincinnati, 76 Fed. 296, 22 C. C. A. 334, Circuit Judge Lurton, speaking for the Circuit Court of Appeals, forcibly declared that if the decision of the state Supreme Court constituted a conclusive interpretation of the contracts or ordinances under which the mortgage, easements, and franchises originated, "the constitutional right of the complainant, as a citizen of a state other than Ohio, to have its right as a mortgagee defined and adjudged by a court of the United States, is of no real value. If this court cannot for itself examine these street contracts, and determine their validity, effect, and duration, and must follow the interpretation and construction placed on them by another court in a suit begun after its rights as mortgagee had accrued, and to which it was not a party, then the right of such a mortgagee to have a hearing before judgment, and a trial before execution, is a matter of form, without substance." It was further said that the courts of the United States will not regard themselves as under any duty to conform to later state court decisions where contracts and obligations have been entered into before there has been any judicial construction, or as to which there have been conflicting decisions. In such a case the federal court will exercise its independent judgment, and will not be bound to follow the opinions of the state court construing such statute rendered after the rights involved in the controversy originated.

Whether the decision of the Supreme Court of Georgia be regarded as in construction of the state Constitution, or as relating to a question of general commercial law in defining the meaning of the word "debt," such decision is not binding upon this court unless it is in harmony with the plain language of the Constitution, or the settled judicial construction thereof existing at the time the contract was entered into, or the bonds issued and sold. The Columbia Avenue Company has a sufficient interest in this controversy to raise these questions and invoke the decision of this court thereon. In the ordi-

nance creating the contract, it is expressly recognized that the water rental should be payable to the waterworks, or to such trustee for its bonds as it might select. The Columbia Avenue Company, having been selected as such trustee, became the alternate payee, and occupied a contractual relation with the city. The mortgage given to secure the bonds conveyed and assigned to the trustee all of the rights and franchises of the water company, including the benefit of its contract with the city. Under this conveyance the trustee is interested in protecting and preserving the security, and to that end may institute and maintain its suit independently of the water company. Louisville Trust Company v. Cincinnati, 76 Fed. 296, 22 C. C. A. 334; Consolidated Water Company v. San Diego (C. C.) 84 Fed. 369; Reagan v. Farmers' Loan & Trust Co., 154 U. S. 362, 14 Sup. Ct. 1047, 38 L. Ed. 1014; Schmidt v. Louisville C. & L. R. Co. (Ky.) 41 S. W. 1015. It therefore becomes of the first importance to ascertain the state of the law and the judicial construction thereof at the time the contract was entered into.

The provisions of the Constitution of 1877, in force at the time, which bear upon the question under consideration, are as follows:

"Debt of Counties and Cities not to Exceed Seven Per Cent. The debt hereafter incurred by any county, municipal corporation, or political division of this state, except as in this Constitution provided for, shall not exceed seven per centum of the assessed value of all the taxable property therein, and no such county, municipality or division shall incur any new debt, except for a temporary loan or loans to supply casual deficiencies of revenue, not to exceed one-fifth of one per centum of the assessed value of taxable property therein, without the assent of two-thirds of the qualified voters thereof, at an election for that purpose, to be held as may be prescribed by law; but any city, the debt of which does not exceed seven per centum of the assessed value of the taxable property at the time of the adoption of this Constitution, may be authorized by law to increase, at any time, the amount of said debt, three per centum upon such assessed valuation." Paragraph 1, § 7, art. 7, Const. 1877 (Code 1895, § 5893).

"City Debts—How Incurred. Municipal corporations shall not incur any debt until provision therefor shall have been made by the municipal government." Paragraph 1, § 10, art. 7, Const. 1877 (Code 1895, § 5897).

The question as to what created a debt, within the meaning of this Constitution, first came before the Supreme Court of Georgia in the case of Hudson v. City of Marietta (Sept. term, 1879) 64 Ga. 286. In that case the city of Marietta exchanged an old for a new fire engine, incurring an indebtedness of $3,000 on account of the exchange. The court, by two justices, declared that such a transaction created a debt, within the meaning of the Constitution.

The next case was that of Spann v. Webster County (Feb. term, 1880) 64 Ga. 498. Webster county purchased a safe, incurring an indebtedness therefor. The court, following Hudson v. Marietta, declared such an indebtedness was forbidden by the Constitution.

The question next came before the court in the case of Mayor of Rome v. McWilliams (Sept. term, 1881) 67 Ga. 106. The city levied a tax to cover an anticipated expenditure for the fitting up of municipal offices. It was alleged to be the purpose of the city to contract an indebtedness on this account. The court, speaking through Mr. Justice Speer, used the following language: "An obligation arising under a contract on the part of a municipal corporation to pay for work when and as it shall be performed in the future does not constitute or ripen into an indebtedness, within the meaning of the Constitution, till at least the performance of the work. [Dively v. City of Cedar Falls] 27 Iowa, 228; [Weston v. City of Syracuse] 17 N. Y. 110. If this were not so, then it would be impossible, in a majority of instances, to even contract for the most necessary public building without a prior levy and deposit of money in the treasury. The obligation to pay so far as the time of its inception as between the parties is concerned, is one thing, and an actual indebtedness, within the meaning of the Constitution, is another. I may enter into a contract for an architect to build me a house, but, if he never does the work, I owe him nothing. So, if I pay him as he progresses, I will not be his debtor. So, if I contract to pay him when the work is done,

I owe him nothing till the contract is fulfilled, and if, on its fulfillment, I discharge it, I cannot be said to have incurred a debt, in the sense the Constitution prohibits corporations from incurring." Chief Justice Jackson concurred in the opinion and the reasons given therefor, and distinguished the case from those of Hudson v. Marietta and Spann against Webster County. Mr. Justice Crawford dissented, principally for the reason stated by him as follows: "But over and above all this comes the Constitution, and declares, among other things, that no county, municipal corporation, or political division of the state shall incur any new debt, except for a temporary loan to supply casual deficiencies of revenue, without the assent of two-thirds of the qualified voters thereof. It is admitted that a new debt could not be incurred except as above provided. Then the question is whether a city can levy a tax with which to pay a future liability that it could not legally incur. If the right exists to make the contract, the time when the payment is to be made is wholly immaterial. It neither enlarges the power, nor changes the nature of the liability. It is the incurring a new debt, whether paid when the work is done, or five years thereafter. It is a debt from the making of the bargain until paid, be that when it may. To say that for a new debt to be incurred, with which to build a town hall, without first submitting it to the people, would be unconstitutional, and to say that the levy of a tax to build a town hall without submitting that to the people would be constitutional, does not seem to me to be either law or logic. This provision in the Constitution was to give the taxpayers the right to say whether the expenditure should be made, and to require their assent before the taxes should be laid for such expenditure." In this dissenting opinion Mr. Justice Crawford makes no reference to the cases of Hudson v. Marietta and Spann v. Webster County, nor does he appear to predicate his opinion thereon.

In City of Conyers v. Kirk & Co. (March term, 1887) 78 Ga. 480, 3 S. E. 442, it appears that the city had contracted to purchase lamps and gasoline for lighting the streets, intending to pay cash therefor. The lamps were used by the city for a limited time, and the gasoline purchase was consumed. The city declined to make payment for several reasons. In discussing the case, Mr. Chief Justice Bleckley uses the following language, citing Mayor of Rome v. McWilliams, 67 Ga. 106, as being in point: "The debt resulted from a breach of the contract, not from the making of it. Against paying a debt so originating there is no constitutional impediment. When a cash purchase is made, there is no expectation that any debt will exist, and there was no such contemplation in this case. If we take the evidence, as we do, most favorably for the plaintiffs, there was no intention that any debt should arise. It was contemplated that payment should be made as soon as the articles were delivered, and the reason indicated in the record why payment was not then in fact made was the accidental absence of the city treasurer from his office. So that this debt (and it is a debt now) became such not by virtue of making the contract, but by virtue of breaking the contract; and surely there never can be and never will be any law against paying a debt which arises from default in making a cash payment at the time the debtor ought to have made it, the cash sufficient for the purpose being then in the debtor's treasury."

Butts v. Little, 68 Ga. 272, was decided in 1881. It was there held that a contract by a county for the erection of a building at a specified price, payable as the work progresses, and to be completed within a given time, where the amount to be paid was more than could be lawfully raised by taxation, was invalid, as creating an indebtedness without complying with the constitutional requirements. The court said, however, that if the parties to the contract could so modify it that the cost of the building could, as it fell due, be met annually thereafter by a levy of lawful taxes, the contract would be valid. The court does not refer to the former case of Mayor of Rome v. McWilliams, with which case the doctrine first declared hardly seems to be consistent.

At the time that the contract under consideration was entered into, the case of Lott v. Mayor of Waycross, 84 Ga. 681, 11 S. E. 558, had been decided by the superior court of the state, and was then pending upon writ of error in the Supreme Court. In this case it appeared that the city had en-

tered into a written contract with one Albertson whereby it was agreed that he should erect a plant and furnish a given number of electric lights for the city for the term of 10 years, in consideration whereof the city was to pay the sum of $2,000 a year, payable monthly. The plaintiff filed a petition for injunction against the further carrying out of the contract on the part of the city, upon the ground that the contract was the incurring of a debt, under the Constitution of the state, without complying with the prerequisite submission to the legally qualified voters of the city. The court refused the injunction, and the plaintiff excepted. The opinion of the Supreme Court is brief and direct. It was delivered by Mr. Justice Blandford, and is as follows: "It is clear to our mind that the mayor and council of Waycross have a right to contract an annual indebtedness for the purpose of supplying lights to the town, and we do not think such a contract would be an indebtedness such as is required by the Constitution to be submitted to the vote of the people of the town. Whether this contract incurs an indebtedness which is required to be submitted to the voters of the town, under the Constitution, it is not necessary for us now to decide. It may be that the question may never arise, even under this contract, if the sum stipulated to be paid annually for the supply of lights is paid as it becomes due; and if this is a reasonable expense to be incurred by the city—and we do not see why it is not —then the question will never arise. Should the city make default of payment, then the question might arise, and it would have to be decided whether this was such a contract as imposed upon the city an indebtedness such as is contemplated by the Constitution to be submitted to the people. 'Sufficient unto the day is the evil thereof.' Let the light shine in Waycross." It is true that the court in this case does not decide whether the contract created an indebtedness such as is required under the Constitution to be submitted to the qualified voters of the town. Taking this case, however, in connection with that of Mayor of Rome v. McWilliams and Butts v. Little, it appears to sustain the proposition that a contract for supplies or service to be paid for at stated times, as delivered or performed, does not create an indebtedness within the constitutional sense. If this be true, then, upon authority of Conyers v. Kirk, 78 Ga. 480, 3 S. E. 442, no indebtedness would arise under this contract, except from a breach thereof, and against paying a debt so originating there is no constitutional impediment. That Lott v. Waycross is susceptible of this construction is evidenced by the fact that it is cited by the Supreme Court of the United States, in the case of Walla Walla v. Walla Walla Water Company, 172 U. S. 1, 19 Sup. Ct. 77, 43 L. Ed. 341, to sustain the proposition that such a contract did not create an indebtedness.

Such was the state of the Georgia decisions at the time this contract was entered into. The contract provided that the city should annually meet the water rentals as they accrued, by the levy of an annual tax. If these water rentals should be paid as they accrued, there would never be any indebtedness, although the obligation to take the water and pay therefor would extend from year to year. As in City of Conyers v. Kirk & Co., 78 Ga. 480, 3 S. E. 442, it was contemplated that payment should be made as the service was rendered, "and there never can be and never will be any law against paying a debt which arises from default in making a cash payment at the time the debtor ought to have made it." So, in Lott v. Waycross, 84 Ga. 681, 11 S. E. 558, the court said that, if the sum stipulated to be paid annually for lights should be paid as it became due, the question whether the contract created a debt would never arise, inasmuch as the expense was a reasonable one to be incurred by the city. The principle in these cases was consistent with that declared in Rome v. McWilliams, 67 Ga. 106, and Butts v. Little, 68 Ga. 272, that the obligation to pay for work when and as it shall be performed in future, by an annual levy of taxes sufficient to meet the accruing installments, does not create an indebtedness, within the meaning of the Georgia Constitution. These cases certainly warrant the conclusion that, at the time the contract was entered into with the water company, contracts of that character had not been declared invalid by the Supreme Court of Georgia. Indeed, that court has deemed it necessary to overrule Butts v. Little (Lewis v. Lofley, 92 Ga. 804, 19 S. E. 57; Dawson v. Waterworks Co., 106 Ga. 727, 32 S. E. 907), and to overrule, qualify, or distinguish several of

the other cases referred to in this report. It cannot, therefore, fairly be said that there was such a settled course of judicial decisions in Georgia on this question, at the time of the making of the contract, as to constrain the courts of the United States to follow later decisions of the state court, especially in a case where the rights of innocent third persons are concerned. Subsequent to the making of this contract, and after the rights of the complainant and the bondholders had been acquired, the Supreme Court of Georgia unequivocally held that contracts of this character constituted the creation of an indebtedness, within the inhibition of the state Constitution. Cartersville Imp. Co. v. Cartersville, 89 Ga. 683, 16 S. E. 25; Cartersville Water Co. v. Cartersville, 89 Ga. 689, 16 S. E. 70; City of Dawson v. Dawson Waterworks Co., 106 Ga. 696, 32 S. E. 907. I therefore conclude that this court is not bound to follow the later decisions of the state court as to the validity of the contract in question, but should exercise its independent judgment with reference thereto.

(3) The contract between the city and the water company contemplated that the company should maintain and perform the water service therein specified from year to year for a period of 20 years. As this service should be performed, the city obligated itself to pay therefor the sum of $2,000 each year, payable semiannually. If the water company should fail to perform the service, the city would be under no obligation to pay. In no event was it liable to pay any installment until the service for which the payment was due had been rendered. The idea of credit did not enter into the transaction. The city did not assume to pay a present indebtedness in future installments, as would have been the case, had it issued bonds payable in future. The whole purpose of the contract was to encourage the construction of a system of waterworks by a private corporation, and to provide for supplying the city and its inhabitants with a water service in accordance with certain specifications. To this end the city gave the right to the use of its streets for the laying of mains and pipes, and agreed to pay semiannually in each year for 20 years a stipulated sum for the free and unrestricted use of the water for fire protection. Upon the faith of these obligations on the part of the city, the water company expended a large amount of money in the construction of a system, which was tested and accepted by the city as satisfactorily complying with the requirements of the contract. That such a contract does not create a debt is not an open question in this forum. Upon this point the case of Walla Walla v. Walla Walla Water Company, 172 U. S. 1, 19 Sup. Ct. 77, 43 L. Ed. 341, is conclusive. In that case the city obligated itself to pay the water company $1,500 annually in quarterly installments, for 25 years, for the use of the water for fire protection. The charter of the city limited the amount of indebtedness it could incur. The sum of the installments agreed to be paid for the period named would, if treated as a debt, cause the indebtedness of the city to exceed the charter limitations. The court, after declaring that the weight of authority, as well as of reason, favors the construction that a municipal corporation may contract for a supply of water or gas, or like necessity, and may stipulate for the payment of an annual rental for the gas or water furnished each year, notwithstanding the aggregate of its rentals during the life of the contract may exceed the city's authorized indebtedness, says: "There is a distinction between a debt and a contract for a future indebtedness to be incurred, provided the contracting party perform the agreement out of which the debt may arise. There is also a distinction between the latter case and one where an absolute debt is created at once, as by the issue of railway bonds, or for the erection of a public improvement—though such debt be payable in the future by installments. In the one case the indebtedness is not created until the consideration has been furnished. In the other the debt is created at once, the time of payment being only postponed. In the case under consideration the annual rental did not become an indebtedness, within the meaning of the charter, until the water appropriate to that year had been furnished. If the company had failed to furnish it, the rental would not have been payable at all, and, while the original contract provided for the creation of an indebtedness, it was only upon condition that the company performed its own obligation." To this proposition the court cites a number of authorities, and continues:

"The obvious purpose of limitations of this kind in municipal charters is to prevent the improvident contracting of debts for other than the ordinary current expenses of the municipality. It certainly has no reference to debts incurred for the salaries of municipal officers, members of the fire and police departments, school-teachers, or other salaried employés to whom the city necessarily becomes indebted in the ordinary conduct of municipal affairs, and for the discharge of which money is annually raised by taxation. For all purposes necessary to the exercise of their corporate powers they are at liberty to make contracts regardless of the statutory limitation, provided, at least, that the amount to be raised each year does not exceed the indebtedness allowed by the charter. Among these purposes is the prevention of fires, the purchase of fire engines, the pay of firemen, and the supply of water by the payment of annual rental therefor."

The Dawson Waterworks Case, 106 Ga. 696, 32 S. E. 907, in which the Supreme Court of Georgia reached a different conclusion in construing the identical contract, has been carefully considered. The court recognized that its ruling on this point was "in direct conflict with a decision of the highest court in the land (the Walla Walla Case), as well as with the current of American authority on the subject." Its decision was based upon the public policy of the state, as read in the light of its past history. Chief Justice Simmons concurred specially, considering himself bound by a former decision in the case (Mayor and Council of Dawson v. Dawson Waterworks Co., 102 Ga. 594, 29 S. E. 755). He says: "If it were an original question, I should hold, in accordance with nearly all the other courts of the Union, including the Supreme Court of the United States, when construing similar provisions of constitutions or statutes, that the making of a contract or agreement by municipal authorities for the supply of gas or water for a term of years, for a certain sum, to be paid annually, is not a debt, within the meaning of the Constitution. It is difficult for me to understand now, after full argument and reflection, how the making of the same contract by the same authority for one year, when there is no money in the treasury to pay it, and taxes are to be levied to meet the obligation, is not a debt, when, if the same authority makes a contract for the same purpose for two years or five years, it is a debt."

It is interesting to note that the Supreme Court of Georgia has quite recently handed down an elaborate opinion in construction of what constitutes a debt of a city, under the constitutional provision under consideration in the instant case. In these cases (Epping v. City of Columbus, 43 S. E. 803, and Roff v. Mayor of Calhoun, 43 S. E. 803, decided March 12, 1903) the respective cities had issued coupon bonds for the purpose of erecting waterworks. The future interest, represented by coupons, if added to the amount of the principal, would exceed the indebtedness that could be legally incurred. The court said: "The debt of a municipal corporation, within the meaning of that provision of the Constitution which prohibits such a corporation from incurring a debt that exceeds 7 per centum of the assessed valuation of all the taxable property within the municipality, is to be ascertained by adding to the principal of all outstanding indebtedness the amount of all accrued interest that may be past due and payable on the day the amount of the debt is to be fixed. In ascertaining the amount of such debt, future interest that is not due on the day it becomes necessary to fix the sum of indebtedness is not to be counted. Unearned interest is not, within the true intent and meaning of the Constitution, a part of the debt of the municipality." The court referred to the Dawson Waterworks Case, 106 Ga. 696, 32 S. E. 907, and drew a distinction predicated upon the statement that "the contract sought to be enforced in that case related to a principal liability payable in annual installments." This distinction is not apparent to the mind of the master, who finds it difficult to understand how an obligation to pay future water rentals as they accrue can differ in principle from a promise to pay future interest as it may be earned.

I conclude on this branch of the case that the contract in question did not create a "debt," within the meaning of the Georgia Constitution.

(4) It is contended on the part of the city that no exclusive franchise to occupy the streets and maintain a water system could be lawfully granted,

and from this it is argued that the franchise may be revoked, and the city may use its streets for its own system. The grant of a right to supply water to a city and its inhabitants, through pipes and mains laid in the streets, upon the condition of the performance of its service by the grantee, is the grant of a franchise in consideration of the performance of a public service, and, after performance by the grantee, is a contract protected by the Constitution of the United States. Walla Walla v. Walla Walla Water Co., 172 U. S. 1, 19 Sup. Ct. 77, 43 L. Ed. 341, and cases there cited. The right of a city to do those things necessary to supply its inhabitants with water for domestic use, or to provide the city with protection against fire, is the settled law of Georgia. Dawson v. Dawson Waterworks Co., 106 Ga. 709, 32 S. E. 907; Frederick v. Augusta, 5 Ga. 561; Rome v. Cabot, 28 Ga. 50; Wells v. Atlanta, 43 Ga. 67. As an incident to the principal undertaking, the city possesses the power to grant the use of its streets, and to contract with a private company for an exclusive supply of water for fire protection. It is unnecessary to decide whether the city may grant an exclusive franchise for a long number of years in excess of the contractual period between the city and the water company. Should a third person in good faith seek a franchise for the use of the streets for a similar purpose, the point would be properly involved. The question now presented is whether the city can directly revoke the grant, or itself use the streets in competition with the water company, in the face of its contract with the water company. The contract does not in terms express an agreement that the city will not, during the life of the contract, erect its own system for the purpose of supplying its inhabitants with water, but it can hardly be doubted that such is the fair implication and reasonable intendment of the contract. The city, having induced the expenditure of money on faith of the promise that it would grant the exclusive use of the streets for the laying of pipes and mains by the water company, and having contracted to pay for the use of water for fire protection for a term of years, will not be permitted, in equity, to disregard its agreements by itself entering into ruinous competition with the other party before the expiration of the contractual term. Southwest Missouri Light Co. v. City of Joplin (C. C.) 101 Fed. 23; Walla Walla v. Walla Walla Water Co., 172 U. S. 1, 19 Sup. Ct. 77, 43 L. Ed. 341. I conclude that the city may not, prior to the expiration of the term for which it contracted for a supply of water for fire protection, directly revoke the grant of the franchise for the use of its streets by the water company, or indirectly impair or destroy the value of the franchise by itself entering into competition with its grantee. To this extent the right is protected by the obligation of the contract entered into. St. Tammany Water Co. v. New Orleans Water Co., 120 U. S. 64, 7 Sup. Ct. 405, 30 L. Ed. 563; Louisville Gas Co. v. Citizens' Gas Co., 115 U. S. 683, 6 Sup. Ct. 265, 29 L. Ed. 510; Bartholomew v. City of Austin, 85 Fed. 359, 29 C. C. A. 568.

(5) I have found that during periods of continuous rainfall the water supplied is muddy, and to some extent contaminated by reason of the surface washings from the watershed. I have also found that at times the reservoir leaked, and that the required pressure was not at all times maintained. The quality of the water is the same as it was during the years the city accepted it as satisfactory. The watershed and its condition were substantially the same then as now. There is no requirement in the contract that the quality of the water should be other than that furnished in its natural state from the sources of supply designated and accepted by the city. It was not required that the water should be filtered, or otherwise rendered more fit for domestic use. An act of the General Assembly made it a misdemeanor to contaminate the watershed so as to affect the quality and purity of the water, and the police supervision of the city was extended over this territory. An ordinance of the city directed the mayor to appoint a committee, whose duty it should be to superintend the waterworks and water supply of the city, and see that the water company complied with their obligations in furnishing water to the city and private consumers. Prior to the repudiation of the contract by the city, no complaint as to pressure or quality of water had been made. No objection of any kind had been presented, and the city seems to have been satisfied with the service and the quality of the water. At no

time since has any complaint been made, until the filing of the answer in this case. Within a reasonable time thereafter the water company erected a new standpipe, of larger capacity and greater pressure, which completely remedied the occasional lack of pressure complained of. At no time has the city filed formal complaint, specifying the grounds of complaint, or called for a test, or given the water company an opportunity of remedying defects, if such existed. It repudiated the contract, and refused to pay the water rentals as they fell due, thus depriving the water company of a large part of its revenue. Nevertheless it continued to receive the benefits of the contract. In circumstances such as these, the city cannot invoke a forfeiture, nor can it plead the facts as a defense to the right of the complainant to relief. Pike's Peak Power Co. v. City of Colorado Springs, 105 Fed. 1, 15, 44 C. C. A. 333; Walla Walla v. Walla Walla Water Co., 172 U. S. 1, 19 Sup. Ct. 77, 43 L. Ed. 341.

(6) The contract, among other things, provided that, in consideration of water to be furnished the public municipal buildings and two public fountains, the city obligated itself to remit to the water company any and all license fees, taxes, dues and charges which might any time be levied or assessed by the city against the company or its plant. The city levied an ad valorem tax on the property of the water company for the year 1895, caused execution to be issued therefor, and placed the same in the hands of its marshal for collection. Further proceedings on this execution have been temporarily enjoined by this court. The complainant contends that this agreement is not to be construed as an exemption from taxation, but that it stipulates for a service that should be received in lieu of taxes, and as a full and fair equivalent therefor. It is urged on the part of the city that the stipulation is an exemption from municipal taxation, or at least a commutation of taxes, and, as such, void under the Constitution and laws of Georgia. I think it clear that the agreement is to be construed as in commutation of city taxes. Cooley on Taxation (2d Ed.) 234. License or occupation taxes may be commuted by a city, but, under the Constitution and laws of Georgia, as uniformly construed by the Supreme Court of the state, there can be neither exemption from, nor commutation of, taxes on property. The language of the Constitution (paragraph 1, § 2, art. 7; Code 1895, § 5883) is as follows: "All taxation shall be uniform upon the same class of subjects, and ad valorem on all property subject to be taxed within the territorial limits of the authority levying the tax, and shall be levied and collected under general laws." Paragraph 4 (section 5886) declares that all laws exempting property from taxation, other than certain enumerated property, shall be void. Under these constitutional requirements, it has been held by the courts that property cannot be classified for the purposes of taxation, nor can taxes on property be commuted, nor any rule of taxation applied excepting that laid down; that is to say, a strict ad valorem tax on all property subject to be taxed within the taxing district. These cases are so numerous and uniform, it is deemed unnecessary to cite them. At the time the contract under consideration was entered into, there was no case qualifying the rigid doctrine as above expressed. In 1892, however, the Supreme Court of the state, in the case of Cartersville Gas Company v. Mayor of Cartersville, 89 Ga. 683, 16 S. E. 25, held as follows: "While a city cannot exempt a gas company from municipal taxation, it can contract to pay for gas a stipulated sum per lamp, and in addition thereto a sum for all the lamps supplied, equivalent to the amount of taxes imposed upon the company, provided this additional sum is a fair and just allowance to compensate for the actual value of the light service, and the stipulation is bona fide, and not in the nature of an evasion of the law prohibiting exemption from taxes." At the same term the court held in the case of Cartersville Waterworks Company v. Mayor of Cartersville, 89 Ga. 689, 16 S. E. 70, that a city had no power to exempt the property of the water company from municipal taxation by contract, and the attempt to grant such exemption was not effectual. The company could neither take the exemption by way of gratuity, nor purchase it by way of commutation. In that case the contract entered into between the city and the water company provided that the water company should erect a system of waterworks, and supply with water for fire purposes a certain number of hy-

drants at a given price; also to supply with water for the payment of city license and taxes for the first 10 years of this contract two drinking fountains, with quarter inch openings of continual flow for man and beast, at such places on the mains as designated by the council. Subsequently the city levied an ad valorem tax on the property of the water company. The agreement above recited was pleaded as against this tax levy. The court held the agreement void, as being an exemption or commutation of taxes. The facts in that case are very similar to those in the instant case. In subsequent cases the court has uniformly held that no escape can be had from the burden of an ad valorem tax on property, whether by contract or under legislative sanction. Atlanta National Building & Loan Association v. Stewart, 109 Ga. 80, 35 S. E. 73. The construction thus given by the highest court of the state to its Constitution with respect to taxation will be followed by the federal courts. Games v. Dunn, 14 Pet. 322, 10 L. Ed. 476; State Railroad Tax Cases, 92 U. S. 575, 23 L. Ed. 663. I conclude on this branch of the case that the agreement between the city and the water company provided for a commutation of city taxes, and is therefore void under the Constitution and laws of the state of Georgia. The water company, however, upon an accounting, will be entitled to be paid or have credit for the value of the water actually supplied the city under this agreement. The Circuit Court of Appeals for this circuit, in the case of Bartholomew v. City of Austin, 85 Fed. 359, 29 C. C. A. 568, held that, where a city undertakes to exempt from taxation the property of a water company in consideration of water furnished the city for certain purposes, if such exemption proves to be void, the company can recover for water furnished under the arrangement.

(7) I have found that in point of fact the maturing interest coupons upon the bonds from September 1, 1895, to March 1, 1899, was paid by the water company from funds loaned to it for that purpose by the American Pipe Company, and that the transaction was merely a loan by the pipe company to the water company, with no agreement that the paid coupons should be assigned, or that the pipe company should become subrogated to the rights of the bondholders. Upon these facts, I conclude that the complainant is not entitled to recover in behalf of the pipe company the interest so paid. When the interest was paid to the trustee by the water company, without notice or reservation, such payment was general, and the indebtedness represented by the coupons was extinguished. The trustee, having once received payment, cannot again enforce it, especially in the interest of one who is not a party to this proceeding, and between whom and the trustee there is no privity of contract. If the pipe company has any legal or equitable rights arising out of the transaction, it must enforce them in its own behalf in a proper suit brought for that purpose.

(8) The right of the complainant to maintain this suit, in so far as concerns the jurisdiction of this court both as a court of equity and as a court of the United States, has been adjudicated on demurrer. The relief to which the complainant is entitled under the facts of the case remains to be considered. The obligation of a contract may be impaired by subsequent judicial decisions as well as by subsequent legislation. Butz v. City of Muscatine, 8 Wall. 575, 19 L. Ed. 490. An ordinance of a city denying liability on a contract with a waterworks company is legislation affecting the obligation of the contract, under the Constitution and laws of the United States; and, where the city has held an election to authorize an issue of bonds to buy or construct waterworks of its own, the water company is entitled to maintain a suit for equitable relief in advance of actual proceedings by the city to impair the company's rights under the contract. Vicksburg Waterworks Co. v. Vicksburg, 185 U. S. 65, 22 Sup. Ct. 585, 46 L. Ed. 808; Los Angeles v. Los Angeles City Water Company, 177 U. S. 558, 20 Sup. Ct. 736, 44 L. Ed. 886.

The defendant city of Dawson has renounced and repudiated the contract with the water company, as being void, and in this it has been sustained by the Supreme Court of the state. The qualified voters of the city have, at an election held for that purpose, authorized the city to issue bonds for the construction of waterworks to be operated by the city. These bonds have been issued, and would have been sold but for this litigation. I conclude that these facts, as well as the other facts found, entitle the trustee to equitable relief,

and bring the case within the rule of law expressed. This suit is proceeding in the name of the trustee as complainant, for the benefit of bondholders, and in order to protect the security for the bonds. An essential part of this security consists in the contract by the city for payment of water rentals as the service should be performed by the water company. The trustee was, under the contract, made an alternate payee. Its right to collect the water rentals upon default of payment of interest by the water company was confirmed in the mortgage given to secure the bonds, and the exclusive right to make such collection has been assigned by the water company, after default, to the trustee. It follows that the trustee has the right to enforce the performance of these obligations in this suit. A court of equity, having obtained jurisdiction of the parties and of the subject-matter, will make its jurisdiction effectual for complete relief, and in such suit will enforce a contract between the city and the water company made prior to the issuance of the bonds, under which contract the city agreed to pay hydrant rentals to the mortgage trustee for the benefit of the bondholders. Fidelity Trust & Guaranty Company v. Fowler Water Company (C. C.) 113 Fed. 560, and cases there cited on pages 571 and 572.

The trustee is entitled to an injunction against the city, forbidding it to construct, maintain, or operate a system of waterworks of its own in competition with the water company, or for the purpose of supplying the city with water for fire protection and municipal use; and the injunction heretofore granted, temporarily restraining the city from issuing bonds for this purpose, should be made perpetual. It would seem that the complainant is further entitled to a mandatory injunction against both the city and the water company, requiring them, and each of them, to specifically perform the contract, as essential to the protection of the security for the bonds. In Union Pacific R. Co. v. Chicago, R. I. & P. R. Co., 163 U. S. 564, 16 Sup. Ct. 1173, 41 L. Ed. 265, the Supreme Court decreed specific performance of a continuing agreement for trackage rights as between railway companies, basing its opinion on this point on the former case of Joy v. St. Louis, 138 U. S. 1, 11 Sup. Ct. 243, 34 L. Ed. 843. The court also cites, upon this point, Franklin Telegraph Company v. Harrison, 145 U. S. 459, 12 Sup. Ct. 900, 36 L. Ed. 776; Prospect Park & C. I. R. Co. v. Coney Island & B. R. Co., 144 N. Y. 152, 39 N. E. 17, 26 L. R. A. 610; and Denver & R. G. R. Co. v. Alling, 99 U. S. 463, 25 L. Ed. 438. In the Union Pacific Case the court said: "But it is objected that equity will not decree specific performance of a contract requiring continuous acts involving skill, judgment, and technical knowledge, nor enforce agreements to arbitrate, and that this case occupies that attitude. We do not think so. The decree is complete in itself, is self-operating and self-executing, and the provision for referees in certain contingencies is a mere matter of detail, and not of the essence of the contract. It must not be forgotten that, in the increasing complexities of modern business relations, equitable remedies have necessarily and steadily been expanded, and no inflexible rule has been permitted to circumscribe them. As has been well said, equity has contrived its remedies 'so that they shall correspond both to the primary right of the injured party, and to the wrong by which that right has been violated,' and 'has always preserved the elements of flexibility and expansiveness, so that new ones may be invented, or old ones modified, in order to meet the requirements of every case, and to satisfy the needs of a progressive social condition in which new primary rights and duties are constantly arising, and new kinds of wrongs are constantly committed.' Pom. Eq. Jur. § 111." The cause of action arising upon a failure to pay water rentals due under a contract after the service has been performed by the water company is a legal cause of action, and the legal remedy is ordinarily adequate. Raton Waterworks Co. v. Raton, 174 U. S. 360, 19 Sup. Ct. 719, 43 L. Ed. 1005.

In the case under consideration, however, a court of equity has taken jurisdiction of the whole controversy at the suit of the trustee, who has an equitable right to enforce the contract for the benefit of the security of the bonds. If I am correct in my findings of fact and conclusions of law as contained in this report, it follows that the complainant is entitled to full and complete relief during the entire life of the contract. A breach of this con-

tract on the part of either the water company or the city would materially affect the security. Should the city refuse to pay future water rentals after they had accrued, the remedy of the trustee would be either in an action at law in the state court, inasmuch as the annual rental does not exceed the sum or value of $2,000, or by supplemental and ancillary bill in this cause and in this court. This court, having assumed jurisdiction of the entire controversy, will not remit the complainant for further relief to the courts of another sovereignty. The remedy by supplemental bill in this court would be allowed only in the exercise of the equitable jurisdiction of the court. The complainant would thus appear to be without a plain, complete, and adequate remedy at law for future breaches of the contract as against the city. Should the water company fail or refuse to comply with its obligations under the contract, the complainant would have an action for damages for such breach; but it appears that the water company owns no property other than that covered by the mortgage to the trustee, so that a suit for damages against it would not measure up to the standard of an adequate legal remedy. Hence I conclude that the complainant is entitled to a decree as against both the city and the water company, requiring them, and each of them, to specifically perform the contract between them.

### General Conclusions.

Upon the whole case I find and conclude as follows:

(1) That the objection to the jurisdiction is not well founded, inasmuch as the jurisdiction rests upon the federal question presented, without regard to the citizenship of the parties.

(2) That the doctrine of res judicata is not applicable to the complainant in this case, for the reason that the complainant was not a party or privy to the state court suit.

(3) That this court is under no obligation to follow the decisions of the highest court of the state, rendered after the contract in question had been entered into, and the rights of the complainant and those it represents had been acquired thereunder; that the decisions of the state courts prior to the execution of the contract were not so long and so firmly established as to constitute a rule of property; and that this court will decide independently whether there is a contract, and whether its obligation has been impaired.

(4) That the contract between the city and the water company did not create a debt, within the meaning of the Constitution and the laws of the state of Georgia, but that such contract is valid and enforceable.

(5) That the exclusive franchise granted by the city to the water company to use the streets and maintain its system of waterworks cannot be revoked by the city in its own interest, nor can its value be impaired by competition on the part of the city itself within the term of twenty years, during which the city obligated itself to take and pay for the water for fire protection.

(6) That the city cannot, under the facts of this case, forfeit the rights and franchises of the water company for inefficient service, or for a failure to supply water of a higher quality of purity, nor can it plead such facts in bar of the equitable relief sought.

(7) That the agreement to accept water for municipal use in commutation of city taxes is inoperative and void under the Constitution and laws of the state of Georgia.

(8) That the complainant is not entitled to set up and enforce in this suit any rights, legal or equitable, that the American Pipe Company may have acquired by reason of furnishing the water company with funds to pay maturing interest coupons on its bonds.

Hall & Wimberly and J. G. Parks, for complainant.
Guerry & Hall and J. A. Laing, for city of Dawson.

PARDEE, Circuit Judge. This cause came on to be heard upon the report of W. A. Wimbish, master in chancery, filed herein on April 27, 1903, and upon the exceptions filed by the defendant the city of Dawson to the report of said master, and upon the motion of

complainant to confirm said report and for final decree; and same was argued by counsel for complainant and defendants, respectively, and the said exceptions to said report were duly heard and considered. Whereupon, upon consideration thereof, it is ordered, adjudged, and decreed by the court:

First. That the exceptions to said report be, and the same are, all and severally, overruled.

Second. Whereupon 'it is ordered, adjudged, considered, and decreed that said report of said master in chancery, W. A. Wimbish, Esq., be, and the same is, in all respects, confirmed, and it is ordered that a decree in favor of the said complainant against the defendants, in accordance with the findings made by said master in said report, be made and entered herein.

Third. In accordance with the findings made by the said master in said report, it is ordered, adjudged, and decreed by the court that the contract entered into between the city of Dawson and the Dawson Waterworks Company, which constitutes the subject-matter of this suit, and a copy of which is annexed to the complainant's bill of complaint, marked "Exhibit B," and by reference made a part of said bill of complaint, is, and it is hereby declared and decreed to be, valid, binding, and enforceable, and that the ordinances, action, and conduct of the city of Dawson, the mayor and council and other officers of said city, whereby it is sought to invalidate the said contract, are unconstitutional and void, as seeking to impair the obligation of said contract. And it is further ordered, adjudged, and decreed that a perpetual injunction be granted to complainant, prohibiting, restraining, and forbidding the city of Dawson, the mayor and aldermen of the said city of Dawson, and the other officers and agents, and their confederates and abettors, from negotiating, selling, or disposing of any of the bonds of the city of Dawson mentioned in complainant's said bill of complaint, authorized by the said city of Dawson to be used in the construction of a system of waterworks by the said city of Dawson, and from constructing, maintaining, or operating any system of waterworks in the city of Dawson for the purpose of supplying either the said city of Dawson or its inhabitants with water for fire protection or domestic use, or from entering into any contract or arrangement with any person, firm, or corporation for the construction, lease, operation, or use of any system of waterworks, or any supply of water for fire protection or other municipal purpose, or from laying mains or pipes, or permitting the laying of pipes or mains, for the construction of waterworks, or from paying out any moneys for waterworks, or from incurring any obligation for waterworks, or from entering into or carrying out any contract for waterworks, save and except the contract referred to in complainant's bill of complaint, or from forbidding or preventing any person, organization, fire company, or agency from carrying out said contract with the Dawson Waterworks Company, or from placing any obstacle in the way of the due carrying out of the provisions and specifications thereof according to its terms, for and during the term of the aforesaid contract, and while said contract shall remain in force.

Fourth. And it is further ordered, adjudged, and decreed by the

court that the said complainant do recover of the said city of Dawson, and that the said city of Dawson do pay to the said complainant, the sum of the water rentals due and unpaid from January 1, 1896, with interest on each installment thereof as the same matured at the rate of 7 per cent. per annum after maturity; that is to say, that the said complainant do have and recover of the said city of Dawson the sum of $16,000, principal debt, together with interest thereon at the rate of 7 per cent. per annum, as follows: $1,000 from January 1, 1896; $1,000 from July 1, 1896; $1,000 from January 1, 1897; $1,000 from July 1, 1897; $1,000 from January 1, 1898; $1,000 from July 1, 1898; $1,000 from January 1, 1899; $1,000 from July 1, 1899; $1,000 from January 1, 1900; $1,000 from July 1, 1900; $1,000 from January 1, 1901; $1,000 from July 1, 1901; $1,000 from January 1, 1902; $1,000 from July 1, 1902; $1,000 from January 1, 1903; $1,000 from July 1, 1903—together with future installments as the same accrue, to wit, $1,000 on the 1st days of January and July in each year hereafter during the continuance of said contract; that is to say, during the term of 20 years that said contract remains of force. And it is ordered, adjudged, and decreed by the court that a writ of fieri facias issue in favor of the complainant against the said defendant for the collection of said rentals, and that such writs may be hereafter applied for as may be necessary to fully carry this decree into effect. And it is further ordered, adjudged, and decreed by the court that an accounting be had before W. A. Wimbish, Esq., special master, between the said Columbia Avenue Savings Fund, Safe Deposit, Title & Trust Company, trustee, and the said Dawson Waterworks Company, and the said city of Dawson, in order that it may be ascertained what, if anything, is due by the said city of Dawson for water furnished by the said Dawson Waterworks Company under the agreement made in commutation of city taxes, and that the value of the water so supplied be allowed as a credit against the demand of the said city of Dawson for the amount due by the said Dawson Waterworks Company as ad valorem taxes on its property; and until said accounting shall be had, and the said city of Dawson shall credit on the proper tax bills the amount due and unpaid by it on account of water rentals, the temporary injunction heretofore granted against the said city of Dawson from proceeding with the collection of tax executions issued by it be continued in force. And it is further ordered, adjudged, and decreed by the court that the city of Dawson and the Dawson Waterworks Company, and each of them, be decreed, directed, and required to specifically perform the aforesaid contract forming the subject of this suit, and to severally comply with their respective obligations arising and to arise thereunder, and, to this end, that an injunction issue, requiring such specific performance. And it is further ordered, adjudged, and decreed that complainant do recover of said defendant the city of Dawson the costs of this proceeding, to be taxed by the clerk, including the compensation of the special master heretofore allowed, for which execution as at law may issue.

Notice having been given of an appeal in this case, a stay of 60 days from date is allowed.